## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ARICK WHITSON, GEORGIA | ] | |
| CHAMPIONSHIP BARBECUE | ] | |
| COMPANY d/b/a | ] | |
| GCBC, | ] | |
| | ] | |
| Plaintiffs | ] | Civil Action No. |
| vs. | ] | 1-17-cv-1987-5-JPB |
| | ] | Jury Trial Demanded |
| CITY OF STOCKBRIDGE | ] | |
| GEORGIA, and ELTON ALEXANDER, | ] | |
| In His Individual Capacity, | ] | |
| | ] | |
| Defendants | | |

---

## PLAINTIFFS ARICK WHITSON AND GEORGIA CHAMPIONSHIP BARBEQUE COMPANY'S RESPONSE IN OPPOSITION TO DEFENDANT ALEXANDER'S RENEWED MOTION FOR SUMMARY JUDGMENT

Greg K. Hecht
Georgia Bar No. 003860
Michael W. Warner
Georgia Bar No. 751326
HECHT WALKER, P.C.

*COUNSEL FOR PLAINTIFFS*
*ARICK WHITSON AND GEORGIA*
*CHAMPIONSHIP BARBECUE*
*COMPANY*

COME NOW, Plaintiffs Arick Whitson and Georgia Championship Barbecue Company d/b/a BBQ Masters, and hereby file their response to Defendant Alexander's Renewed Motion for Summary Judgment, respectfully showing the Court as follows:

## I.   INTRODUCTION

This case began in or around May of 2016 when the Plaintiffs, a chef ("Mr. Whitson"), and his small but successful barbeque restaurant ("GCBC") in Stockbridge, Georgia, were the target of an attempted extortion by a vindictive Stockbridge City Councilman, Defendant Elton Alexander. (Whitson Aff. ¶¶3-7). When Mr. Whitson refused to acquiesce to the extortionate demand of the elected Stockbridge government official - a quid-pro-quo attempt to get free food in exchange for favorable treatment by the City of Stockbridge (the "City")- this story should have ended that day. (*Id.*). However, unfortunately for the Plaintiffs, in the days, weeks, months, and now years that have followed, Councilman Alexander, with the full knowledge and acquiescence of the City, began a continuous, deliberate, and targeted campaign of harassment, retaliation, defamation, and egregious unconstitutional misconduct against Plaintiffs. As a result, Plaintiff Whitson and his business have suffered substantial personal and economic damages.

Plaintiffs have alleged 42 U.S.C. § 1983 claims against the City of Stockbridge and Councilman Alexander, which consist of a First Amendment

Retaliation claim, an Equal Protection claim, and a procedural due process/reputational injury claim[1]. In addition, Plaintiffs have alleged a state law defamation claim against Councilman Alexander, in his individual capacity. The evidence in the record and the exhibits attached hereto establish that questions of material fact exist concerning each of the alleged claims, precluding the Councilman Alexander from an award of summary judgment. Specifically, the evidence establishes that: (1) Councilman Alexander and the City's retaliatory conduct, including their defamatory statements, caused an adverse effect on Plaintiffs' constitutionally protected speech; (2) Councilman Alexander and the City treated Plaintiffs differently than similarly situated businesses and individuals with no rational basis for doing so;   (3) Councilman Alexander and the City altered or extinguished Plaintiffs' liberty interest through stigmatizing and defamatory statements concerning Plaintiffs; (4) the City had a custom, policy, and/or practice that caused each alleged deprivation; (5) Councilman Alexander intentionally, deliberately and maliciously, made false, defamatory and libelous statements about Plaintiff Whitson and GCBC, some of which constitute defamation per se; and (6) Councilman Alexander is not entitled to any form of immunity, nor were the

---

[1] The § 1983 claims alleged against Councilman Alexander are essential claims against the City.

defamatory statements he made privileged. Thus, Defendant Councilman Alexander's Renewed Motion for Summary Judgement should be denied.

## II.    ARGUMENT AND CITATIONS OF LEGAL AUTHORITY

### A.    The Summary Judgment Standard

Summary judgment is appropriate only if the movant shows there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* A party seeking summary judgment bears the initial responsibility for advising the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Moreover, the moving party must establish that there is no triable issue of fact as to all the elements of any issue on which the moving party bears the burden of proof at trial. If the movant meets its burden, the burden shifts to the non-movant to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). However, summary judgment is not appropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248. Finally, "[i]n reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are drawn in [its] favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-999 (11th Cir. 1992).

B.   The Constitutional Violations of Councilman Alexander

   a.   **Plaintiffs' Evidence Shows a Genuine Question of Whether Councilman Alexander Retaliated Against Plaintiffs' Exercise of Thier First Amendment Rights.**

The Eleventh Circuit has found, "Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact-intensive inquiry . . . ." *Bennett v. Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005). The elements to establish a First Amendment retaliation claim in the Eleventh Circuit are that (1) the plaintiff's speech was constitutionally protected; (2) the defendant's conduct adversely affected the protected speech; and (3) there is a causal connection between the retaliatory actions of the defendant and the adverse effect on the speech. *Id.* at 1253. Under the second element, the Eleventh Circuit Court of Appeals has adopted an objective standard and held that "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would deter a person or ordinary firmness from the exercise of First Amendment rights." *Id.* at 1254. When applying the objective standard analysis, the 11th Circuit Court of Appeals has also held that

private citizen plaintiffs are subject to a lower burden than public employees when proving an adverse effect on speech. *Id.* at *1252-53. In addition, this Court has recognized that an adverse effect on speech may be shown by both individual retaliatory acts as well as by the aggregate effect of multiple less-significant retaliatory acts. *See Menden v. City of Mountain Park*, 2009 WL 10698800, *7 (N.D. Ga 2009) (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982), the "entire campaign of harassment which though trivial in detail may have been substantial in gross.").

Under the third prong, to establish a causal connection between the retaliatory actions of the defendant and the adverse effect on speech, courts have held that the plaintiff must establish that the defendant was subjectively motivated to take the adverse action because of the protected speech. *Moon v. Brown*, 939 F.Supp.2d 1329, 1348 (M.D. Ga 2013). In other words, the speech was the motivating factor behind the retaliatory conduct. *Bennett*, 423 F.3d at 1250. The causal connection requirement can be established in several ways, including "through indirect evidence by proving a chronology of events from which the retaliation can be inferred" or by a showing of close "temporal proximity" between the speech and the allegedly retaliatory conduct. *Id.* at 1350; *Menden*, 2009 WL at *15.

Finally, the 11th Circuit Court of Appeals has held that the threshold for a private plaintiff to establish a claim for First Amendment retaliation is low. *See*

*Bennett*, 423 F.3d at 1253 (noting that only "trivial" injuries or "de minimus" inconveniences are insufficient to be adverse); 677 F.2d at 625 ("[T]he effect on freedom of speech may be small, . . . it need not be great in order to be actionable."). In fact, a plaintiff need not prove that he was actually denied his First Amendment rights to be successful on a First Amendment retaliation claim. *Id.* Rather, a plaintiff only needs to show that a person of "ordinary firmness" would likely be deterred from exercising those rights as a result of the harassment the plaintiff received. *Id.* (holding that the "claim depends not on the denial of a constitutional right but on the harassment . . . received for exercising their rights").

In *Bennett v. Hendrix*, the plaintiffs, small business owners, brought 42 U.S.C. § 1983 claims against Forsyth County and the sheriff of Forsyth County for allegedly violating their First, Fourth, and Fourteenth Amendment rights. *Bennett*, 42 F.3d at 1249. The plaintiffs alleged that after publicly supporting a referendum that would have diminished the powers of the Forsyth County Sheriff's Department, the defendant sheriff and other department officers engaged in a "campaign of retaliation and intimidation against the plaintiffs because of their support of the referendum." *Id.* Such allegedly retaliatory acts included surveilling the plaintiffs' homes and businesses, stopping their cars without reason, issuing false traffic citations, and mailing flyers to 35,000 homes in Forsyth County calling the plaintiffs "real criminals," members of a chain gang," and the "same type of criminals that

terrorize Forsyth County." *Id.* The district court denied summary judgment for the defendants on the First Amendment retaliation claims, and the defendants appealed.

In affirming the district court's decision, the Eleventh Circuit in *Bennett* adopted the "ordinary firmness" test, outlined above, and reiterated a plaintiff's low evidentiary threshold to establish a First Amendment retaliation claim. *Id.* In addition, the *Bennett* court favorably cited several cases from other circuits where small harassing acts were deemed sufficiently adverse to satisfy the "ordinary firmness" test. *See id.* at 1255; *see Garcia v. City of Trenton*, 248 F.3d 726, 729 (2d Cir. 2001) (finding the retaliatory issuance of $35 of parking tickets was sufficiently adverse to chill a person of ordinary firmness and raised a jury question); *see Keenan v. Tejada*, 290 F.3d 252, 259 (5th Cir. 2002) (finding that officers stopping and detaining the plaintiff for an unreasonable time was sufficiently adverse); *see Bloch v. Ribar*, 156 F.3d 673, 680-81 (6th Cir. 1998) (finding the sheriff's retaliatory public release of the details of plaintiff's sexual assault was sufficiently adverse); *see Bart*, 277 F.2d at 624-25 (holding a plaintiff up to ridicule for bringing a birthday cake to the office was sufficiently adverse to raise a jury question). Lastly, in affirming the denial of summary judgment, the *Bennett* court concluded that the alleged retaliatory acts of harassment and intimidation by local police officers, taken in light most favorable to the plaintiffs, were sufficiently adverse to chill a person of ordinary firmness from exercising his or her First Amendment rights. 423 F.3d at 1255.

Since the holding in *Bennet*, courts within the 11th Circuit, including the Northern District of Georgia, have consistently applied the "ordinary firmness" test in the context of First Amendment retaliation claims and have deemed a wide-range of alleged retaliatory conduct by cities and city officials as sufficiently adverse to deny a municipality's motion for summary judgment or motion to dismiss. *See*, *e.g.*, *Bailey v. Wheeler*, 843 F.3d 473, 482-83 (11th Cir. 2016) (holding the sheriff department's alleged retaliatory issuance of a "be-on-the-lookout" advisory labeling the plaintiff former police officer as "a loose canon," "a danger," and displaying his picture was sufficiently adverse); *see also Menden v. City of Mountain Park*, 2009 WL 10698800, *1, *15 (N.D. Ga. 2009) (holding that (1) speech critical of and concerning the city was constitutionally protected; (2) the alleged retaliatory issuance of code enforcement citations and a stop work order on construction were "sufficiently harassing to cause an 'adverse effect' on . . . speech;" and (3) the close temporal proximity between the protected speech and the alleged retaliatory conduct indicated causation); *see also Moon v. Brown*, 939 F.Supp.2d 1329, 1349-50 (M.D.Ga. 2013) (denying the city's motion for summary judgment because the mayor's alleged retaliatory towing of a truck bearing a political sign, costing $90 to recover, was sufficiently adverse to deter a person of ordinary firmness).

Most recently, in *Fuller v. Carollo*, the Southern District of Florida adopted the Report and Recommendation of the United States Magistrate Judge concerning

a First Amendment retaliation claim brought under § 1983 with facts strikingly similar to those in the present case. *Fuller v. Carollo*, No. 1:18-cv-24190-RS, Doc. 99, p. 27 (S.D. Fla. 2018) (*appealed on other grounds*); *Fuller v. Carollo*, No. 1:18-cv-24190-RS, Doc. 118. The plaintiffs in *Fuller*, local businessmen, alleged that the City of Miami and the City Commissioner, Mr. Carollo, engaged in a campaign of retaliatory conduct against the plaintiffs for their support of Carollo's political opponent in a run-off election. *Fuller*, No. 1:18-cv-24190-RS, Doc. 99 at 2. The alleged retaliatory conduct, which eventually led to an ethics complaint being filed against Carollo, included Code Enforcement "drive-bys" searching for violations at the plaintiffs' businesses, making representations to plaintiffs' employees and independent contractors that the plaintiffs had been cited for ordinance violations, the revocation of the plaintiffs' temporary use permit that allowed their participation in a local farmer's market, and defamatory statements made by Carollo on local radio stations implying that the plaintiffs were supporting corrupt governments and investors and making the district less culturally diverse. *Id.* at 14-15.

In denying the defendants' motions to dismiss, the district court held that the alleged retaliatory conduct satisfied the three-prong test from *Bennett* - (1) the plaintiffs' speech was constitutionally protected speech, (2) the alleged acts of defendant Carolla and the city would likely have an adverse effect upon a person of ordinary firmness engaging in the protected speech, (3) and the temporal proximity

between the speech and alleged retaliatory conduct suggested a causal connection between the two. *Id* at 15-17.

In the present action, the evidence shows a genuine question of whether Councilman Alexander retaliated against Plaintiffs' exercise of their First Amendment rights under the *Bennett* test. Concerning the first element of Plaintiffs' retaliation claim, Defendant Alexander incorrectly states that Plaintiffs' protected speech was limited to the complaint that Mr. Whitson submitted to the City against Councilman Alexander on January 31, 2017 (the "City Complaint"). (Whitson Aff. ¶ 25, Whitson Dep. – 186 ls 21 thru ls p. 187 ls 25; Ex. 7; Doc. 214-1, p. 17). Approximately six months prior to Plaintiff Whitson submitting his City Complaint in January 2016, Mr. Whitson complained directly with several city officials about Councilman Alexander's extortion attempt and targeted code enforcement on or about August 12, 2016 at City Hall. (Johnson Dep. – 80 ls 16 thru p. 81 ls 5; Ex. 29; Patterson Dep. – 8 ls 10-18; Kilgore Dep. – p. 29 ls 17 thru p. 30, ls 22, p. 33 ls 7 thru p. 34 ls 6; Alexander Dep. – p. 326 ls 1-22; Sellers Dep. – p. 52 ls 13-20). This meeting was scheduled at the request of Councilman Alexander after targeting Plaintiffs in his new drive by program. *Id.* Plaintiff Whitson's complaints communicated during this meeting squarely fall within the protections afforded by the First Amendment. (*Id.*).

In analyzing the second prong in *Bennett*, the evidence is replete with examples of adverse conduct committed against the Plaintiffs by the Councilman Alexander, many of which alone would be sufficient to deter a person of ordinary firmness from the exercise of First Amendment rights based upon the less harassing acts deemed sufficiently adverse in the cases cited above[2]. Following Plaintiffs' complaints concerning Councilman Alexander's attempted quid-pro-quo to the City's head of code enforcement, the City Planner, and a code enforcement officer in or around July of 2016, Mr. Whitson began experiencing a significant increase in code inspection visits by the City, similar to the plaintiffs in *Menden* and *Fuller*. (Whitson Aff. ¶ 14; Doc. 201-5 Cunningham Aff. – pars. 5-11). In fact, TD Johnson, the code inspection officer to whom Mr. Whitson complained directly, testified that he alone visited Mr. Whitson or GCBC 10-15 times in 2016. (Johnson Dep. – p. 26 ls 4-23). Also analogous to the adverse conduct in *Fuller*, Councilman Alexander created a new code enforcement ride along program in the summer of 2016 to perform targeted drive-bys with the head of code enforcement and TD Johnson searching for violations at GCBC. (Johnson Dep. – p. 20 ls 21 thru p. 25 ls 13; Alexander Dep. – 328 ls 13-16 and ls 22-25; Ex. 29). The harassing conduct with regard to code enforcement continued through the end of 2016 at Councilman

---

[2] An exhaustive list of the Councilman Alexander's adverse conduct is chronicled in Plaintiffs' Statement of Additional Facts, attached hereto.

Alexander's direction and with the City's full knowledge. (Whitson Aff. ¶ 74-78; Harris Dep. – 121 ls 1 thru p.122 ls22; Ex. 24; Harris Dep. – p. 123 ls 11 thru p. 124 ls 3). Specifically, in December of 2016, Councilman Alexander confronted Plaintiff Whitson at the GCBC restaurant, and Alexander admitted having instructed code enforcement to target Plaintiffs' previous location. (Whitson Aff. ¶ 74-75). After this confrontation, Plaintiff Whitson received more code enforcement visits. (*Id.*).

In addition to Councilman Alexander weaponizing code enforcement against Plaintiffs, the City's refusal to process Plaintiffs' sign permit and alcohol license are also sufficiently adverse under *Bennett*. On or about December 15, 2016, Plaintiffs filed their sign permit application with the City for the new GCBC restaurant at 72 Hwy 138. (Ex. 74). Similarly, on January 9, 2017, Plaintiffs filed their alcohol permit application and fee to the City for processing. (Ex. 163; Whitson Aff. ¶ 99). Despite the applications being properly submitted and the corresponding fees being paid, the City refused to process either the sign or alcohol permit and they continue to remain in limbo. (Doc. 190 City Williams I Dep. p. 223 ls 15 thru p. 227 ls 7; Sellers Dep. – p. 46 ls 25 thru p. 47 ls 24; Holiday Dep. – p. 237 ls 20-24). In addition, during the relevant permitting timeframe, the City officials who were directly responsible for processing Plaintiffs permits received several stigmatizing and defamatory statements about Plaintiff Whitson from Councilman Alexander including a false statement that Mr. Whitson was a registered sex offender and had illegally

remodeled his business. (Harris Dep. – 116 ls 5 thru p. 117 ls 9;  p. 138 ls 23 thru p. 139 ls 6; ).

Lastly, Defendant Alexander, acting in his official role as a City Councilman, together with the City of Stockbridge, subjected Plaintiffs to a continuous, multi-year, public campaign of personal smears and defamatory attacks, intended to intimidate, humiliate, and harass Plaintiffs for exercising their First Amendment rights. (Ex. 9; Ex. 27; Ford Dep. – p. 168, ls 8-23; Holiday Dep. – 150 ls 1-4; WA ¶ 44; Ex. 71; Ex. 72; Ex. 123; Ex. 125; Ex. 127; Ex. 400; Ex. 401; Ex. 402; Ex. 403). Throughout 2016 and 2017, Councilman Alexander publicly made numerous false and stigmatizing statements about Plaintiff Whitson and GCBC on City-linked social media accounts, via City email, and in person because Plaintiffs exercised their First Amendment rights. (*Id.*). These false and stigmatizing statements made in Councilman Alexander and stated as fact included that Plaintiff Whitson was a "registered sex offender" and on the "sex offender registry." (Whitson Aff. ¶ 46; Ex. 400; Ex. 401; Ex. 402) Between 2016 and 2019 Councilman Alexander made numerous additional stigmatizing and defamatory statements, which increased in frequency and severity after Plaintiffs filed the City Complaint – these are discussed in greater detail below with regard to Plaintiffs' claim for defamation.

Under the third prong in *Bennett*, Plaintiffs' exercise of their First Amendment Rights was the motivating factor behind Councilman Alexander and the City's

adverse action – the increased code enforcement visits, the denial of the sign and alcohol permits, and the defamatory and stigmatizing statements made about Plaintiffs. The close temporal proximity between and indirect evidence linking Plaintiffs' exercise of their First Amendment rights and the adverse actions of Councilman Alexander and the City establish causation. *See Menden*, 2009 WL at *15. As stated above, code enforcement visits began increasing significantly shortly after Plaintiffs met with City officials in the summer of 2016 to complain about Alexander's quid-pro-quo attempt. (WA ¶ 14 ; Doc. 201-5, Cunningham Aff. – pars. 5-11; Johnson Dep. – p. 26 ls 4-23). Around the same time, Alexander created a new code-enforcement ride along program that targeted Plaintiffs. (Johnson Depo – p. 20 ls 21 thru p. 25 ls 13; Alexander Dep. – 328 ls 13-16 and ls 22-25; Ex. 29). Concerning the sign and alcohol permits, Plaintiff Whitson submitted his City Complaint concerning Councilman Alexander on January 31, 2017, the same time-period in which Plaintiffs' permits were pending with the City. In addition, the Mayor, Council, Code Inspector TD Johnson, Community Development Director Hall, Official Clerk Holiday and City Manager Harris received several false and stigmatizing statements from Councilman Alexander about the Plaintiffs during this time period. (Harris Dep. – p. 111 ls 13 thru p. 112 ls 1, p. 119 ls 10-17, p. 124 ls 14 thru p. 126 ls 10, p. 129 ls 22 thru p. 131 ls 7, p. 137 ls 14-18, p. 138 ls 22 thru p. 139 ls 6, p. 141 ls 15 thru p. p. 142 ls 19, p. 144 ls 21 thru p. 145 ls 19, p. 148 ls 14-

25; Johnson Dep. – 35, ls 1-21, p. 37 ls 15-25, p. 39 ls 22 thru p. 40 ls 3; p. 40 ls 11 thru p. 42 ls 6; p. 43 ls 13 thru p. 45 ls 1, Exs 24- 25, 36-39, 67, 69, 72; Holiday Dep. – p. 172 ls 2 thru 23). Finally, in the days and weeks immediately following the filing of Mr. Whitson's City Complaint on January 31, 2017, Councilman Alexander, with the knowledge and acquiescence of the City, increased and intensified his campaign of making stigmatizing and defamatory statements about Plaintiffs via City email, City-linked Facebook, and in person. (Ex. 9; Ex. 27; Ford Dep. – p. 168, ls 8-23; Holiday Dep. – p. 150 ls 1-4; WA -  ; Ex. 71; Ex. 72; Ex. 123; Ex. 125; Ex. 127; Ex. 401; Ex. 402; Ex. 403; Ex. 404).

### b.   Plaintiffs' Evidence Shows a Genuine Question of Whether the City Treated Plaintiffs Differently Than Similarly Situated Individuals and Businesses With No Rational Basis.

The Equal Protection Clause provides that "[n]o State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, §1. In *Village of Willowbrook v. Olech*, the Supreme Court emphasized that "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person . . . against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). As such, the Court recognized that protections afforded under the equal protection clause are not limited to those individuals belonging to a

protected class. *Id.* Rather, the Supreme Court held that "equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," are also recognized. *Id.* To establish a "class of one" equal protection claim in the Eleventh Circuit, "the plaintiff must show (1) that he was treated differently from other similarly situated individuals, and (2) that the defendant unequally applied a facially neutral ordinance for the purpose of discriminating against him." *Leib v. Hillsborough County Public Transp. Com'n*, 558 F.3d 1301, 1307 (11th Cir. 2009). In addition, "class of one" plaintiffs must identify at least one comparator that is similarly situated in all relevant respects for the equal protection claim to survive. *See Kaleta v. City of Anna Maria*, 2017 WL 4417673, *2 (M.D. Fla. 2017). Moreover, "determining whether individuals are similarly situated is generally a question of fact for the jury . . . ." *Smith v. Atlanta Independent School Dist.*, 633 F.Supp.2d 1364, 1382 (N.D. Ga. 2009). Finally, the Eleventh Circuit has held that "class of one" claims are generally easier to prove where the challenged governmental decision is simple, one-dimensional, or involves non-discretionary action. *Leib*, 558 F.3d at 1307.

In *Lexra, Inc. v. City of Deerfield Beach, Fla*., the plaintiff bar owners brought an equal protection claim under Section 1983 against the City of Deerfield Beach on the basis that the city allegedly did not enforce its 2:00 a.m. closing-time ordinance

against another bar, All Stars, which was similarly-situated to the plaintiffs. *Lexra, Inc. v. City of Deerfield Beach, Fla*, 593 F.Appx. 860, 864-65 (11th Cir. 2014). The closing-time exception afforded to All Stars, which allowed it to remain open after 2:00 a.m., was allegedly negotiated by the city manager in exchange for the owner of All Stars not opposing annexation of the area in which it and the plaintiffs' bars were located. *Id.* at 864. The district court granted the city's motion to dismiss with regard to the equal protection claim, and the plaintiffs appealed. *Id.* at 862.

On appeal, the Eleventh Circuit held that the plaintiffs properly brought a "class-of-one" equal protection claim under the *Olech* standard, and it reversed dismissal of the claim. *Id.* at 865-66. Specifically, the court determined that the plaintiffs named a comparator business in the complaint, All Stars, that was similarly situated to plaintiffs "in all material respects[3]." *See id.* at 864. The court in *Lexra* also determined that no rational basis existed for the disparate treatment of the plaintiffs' bars and All Stars with regard to the enforcement of the closing-time ordinance. *See id.* (finding that an agreement with All Stars to not object to annexation did not constitute a rational basis).

In *Kaleta v. City of Anna Maria*, the plaintiff, a licensed general contractor, brought "class of one" equal protection and First Amendment retaliation claims

---

[3] Both All Stars and the plaintiffs were bars that served alcohol located in the same general area of Deerfield Beach, Florida.

against the city under § 1983. *Kaleta*, 2017 WL 4417673, *1 (M.D. Fla. 2017). The plaintiff alleged that the city subjected his construction projects to different requirements than similarly situated properties and intentionally and arbitrarily treated the plaintiff's business differently than similarly situated builders. *Id.* The plaintiff further alleged that these actions were taken in retaliation for his exercise of First Amendment rights. *Id.* The defendant city moved for summary judgment, and the district court denied the city's motion on all claims. *Id.*

Concerning the equal protection claim, the *Kaleta* court determined that fact issues precluded summary judgment arising from determinations of whether comparator businesses were similarly situated and whether the city had a rational basis for its disparate treatment of the plaintiff, its properties and projects. *Id.* at *3-5. In support of its decision, the court identified, among other evidence that: (1) the city only required that plaintiff's construction project have chain link fence; (2) the mayor directed a building official to issue a stop work order at the plaintiff's property despite the fact that no unpermitted work had occurred there; (3) the mayor ordered utilities to be shut off at only plaintiff's property and he had never previously ordered a builder's utilities shut off; and (4) the city filed a complaint against the plaintiff with a licensing agency, which it had never previously filed against any other builder. *Id.* at *3-5. Concerning the other claims alleged by the plaintiffs, the *Kaleta* court also determined that genuine issues of material fact existed with regard to

whether the city retaliated against the plaintiffs' exercise of their First Amendment rights and whether the challenged actions were officially sanctioned or ordered by the city, thus subjecting it to § 1983 liability. See *id.* at *5-6 (holding that the three-prong test in *Bennett* was satisfied and also finding that "a reasonable juror [could] find that the city officially sanctioned the challenged actions of its officials and employees, [e]ven if those officials did not actually have that authority. . .").

Most recently, in *Egres Society, Corp. v. City of Brookhaven, Georgia*, this court analyzed a "class of one" equal protection claim brought by local nightclub/restaurant owners against a municipality under the rigorous "substantial likelihood of success" standard in the context of a preliminary injunction. *Egres Society, Corp. v. City of Brookhaven, Georgia*, 2018 WL 3586719, *4 (N.D. Ga. 2018). In *Egres*, the plaintiffs challenged the disparate enforcement of the city's new Alcoholic Beverage Ordinance, which recategorized alcohol-selling businesses, and as a result, significantly increased the alcohol license costs and substantially reduced the hours and days of operation for the plaintiffs. *Id.* at *1. The plaintiffs were categorized as the more restrictive and expensive "entertainment venues" as opposed to "restaurants" under the new ordinance because they had either a DJ, stage, or dance floor. *Id.* The plaintiffs alleged that the city arbitrarily granted other businesses "restaurant" alcohol licenses that had DJs, stages, or dance floors, including the named comparator Pink Pony, while denying the plaintiffs' applications for

"restaurant" alcohol licenses. *Id.* at *2. Following the denial of their license appeal, the plaintiffs filed § 1983 claims against the city, including an equal protection claim, and sought a preliminary injunction against the selective classification under the new ordinance. *Id.*

In granting the preliminary injunction in *Egres*, this court held that the plaintiffs would have a substantial likelihood of success on their "class of one" equal protection claim. *Id.* at *5. First, this court determined that the Pink Pony was a similarly situated business under *Olech*. *Id.* at *4 ("Because the gravamen of the [p]laintiffs' equal protection claim is that they have to follow the requirements of the Ordinance while Pink Pony does not, the businesses are similar <u>in all relevant respects</u>." (*underline added*)). In addition, this court noted that the ordinance is largely non-discretionary. *Id.* Next, this court found that there was no rational reason for the selective enforcement of the alcohol ordinance. *Id.* at 5 (stating that Pink Pony should "at least be labeled as an entertainment venue."). *Id.* Lastly, this court determined it immaterial that the city was not enforcing the alcohol ordinance against the plaintiffs during the litigation. *Id.* at *6. ("At any point, however, the City could choose to do otherwise.").

In the present action, the evidence shows a genuine question of whether the City treated Plaintiffs differently than similarly situated individuals and businesses with no rational basis. As a general matter, Plaintiffs' position is that although

Councilman Alexander does not directly issue licenses and permits, he used his official position to exert intimidation, influence, and control over the City officials responsible for issuing such permits – and he did so in retaliation for Plaintiffs exercising their First Amendment rights, as evidenced below and in Plaintiffs' Statement of Additional Facts.

Under the first prong of establishing Plaintiffs' "class of one" equal protection claim from *Olech*, the evidence shows that Plaintiffs' identified comparator businesses from the Revised Consolidated Amended Complaint are similarly-situated to Plaintiffs in all relevant respects. (Doc. 183, ¶¶ 81, 83, 84).  Specifically, the comparators identified are commercial establishments located in Stockbridge, Georgia, including restaurants and retail stores of similar size to GCBC, that have applied for sign and/or alcohol permits from the City, and are under the authority of the City's codes and ordinances. (Whitson Aff. ¶¶ 35-37; 50-52.). Because Plaintiffs allege that they were treated differently from the identified comparators with regard to code enforcement, alcohol permitting, and sign permitting, i.e. the gravamen on their equal protection claim, Plaintiffs are similarly situated to these businesses, as analogous to the bars and restaurants in *Egres* and the general contractors and properties in *Kaleta*. *Egres*, 2018 WL 3586719, *4; *Kaleta*, 2017 WL 4417673 at *3-5.

Next, the evidence establishes that Plaintiffs were treated differently than the identified, similarly-situated comparators with no rational basis. With regard to Plaintiffs sign permit application, no other business in Stockbridge has ever been either denied or withheld a sign permit based on having excessive signage or grandfathering deficiencies – only Plaintiffs. (City Williams II Dep., p . 54 ls 17 thru p. 59 ls 21; HD – p. 200 ls 1-25, Ex. 92-94, 101; Kilgore Dep. – p. 52 ls 10 thru p. 56 ls 13; p. 60 ls 3 thru p. 66 ls 9; Ex's 92-101; Ex.'s 193 -202, 207; Johnson Dep. – p. 72 ls 2 thru p. 77 ls 18, p. 134 ls 10 thru p. 135 ls 25, p. 137 ls 21 thru ls 9). Concerning code enforcement, Plaintiffs were visited approximately 15 to 25 times between May 2016 and April 2017 and were the first target of Councilman Alexander's new ride along program with code enforcement. (Johnson Dep. – p. 20 ls 21 thru p. 25 ls 13, p. 100 ls 14 thru p. 101 ls 9; Alexander Dep. – 328 ls 13-16 and ls 22-25; Ex. 29). TD Johnson, the code inspector for Stockbridge, could not recall any other business in Stockbridge who was visited by code enforcement as frequently. (Johnson Dep. –  p. 100 ls 14 thru p. 101 ls 9). Moreover, the City has no knowledge or record of any of the similarly situated comparators ever being issued a warning, citation, or any other code enforcement action. (Johnson Dep. - p. 72 ls 2 thru p. 77 ls 18, p. 134 ls 10 thru p. 135 ls 25, p. 137 ls 21 thru ls 9 ; Harris Dep. – p. 198 ls 23 thru p. 199 ls 25; Ex's 92-101). With regard to Plaintiffs' alcohol permit application, the City was unable to identify a single other establishment for

which the City refused to process an application without providing a denial. (Harris Dep. – 170 ls 8 thru p. 171 ls 25; p. 188 ls 19 thru p. 189 ls 19; p. 191 ls 5 thru p. 193 ls 1; Ex. 89 and Ex.'s 78-86). In fact, C-Port Seafood, a named comparator and the restaurant that occupied Plaintiffs' building only a few months before Plaintiffs, was given their permits by the City. (Harris Dep. - p. 176 ls 9 thru p. 178 ls 18, Ex 78; Sellers Dep. – p. 10, ls 20 thru p. 13 ls 20; Whitson Aff. ¶ 36). Furthermore, numerous other identified, similarly situated businesses were awarded their alcohol permits during the same relevant timeframe when the City refused to process Plaintiffs'. (Harris Dep. – p. 170 ls 8-22, p. 179 ls 12 thru p. 180 ls 22; p.  184 ls 10 thru p 189 ls 19, p. 191 ls 5 thru p. 193 ls 1; p. 203 ls 16 thru p. 204 ls 12 ;  Sellers Dep. – p. 53 ls 4 thru 21; p. 55 ls 6 thru p. 60 ls 25; p. 62 ls 8 thru p. 64 ls 8; Sellers Dep. – p. 53 ls 4 thru 21; p. 55 ls 6 thru p. 60 ls 25; p. 62 ls 8 thru p. 64 ls 8; Ex.'s 79- 89, 102, 164-167).

In Alexander's Renewed Motion for Summary Judgment, Alexander argues that Plaintiffs' equal protection claim should fail if the City has decided not to enforce the sign ordinances against Plaintiffs. (Doc. 204-1). This argument is without merit. As the court in *Egres* pointed out, "at any point, however, the City could choose to do otherwise." *See* 2018 WL 3586719 at *6 (finding that the municipality's choice to not enforce the alcohol ordinance against the plaintiff was immaterial).

Lastly, the City testified in its 30(b)(6) deposition that that there is no individual discretion in the processing, granting, or denial of sign and alcohol permits. (Doc. 190, p. 146, ln 10 – p. 147, ln 4). Rather, the objective requirements and policies in the ordinances govern. Id; *See Leib*, 558 F.3d at 1307 (finding that "class of one" claims are easier to prove when the challenged action does not involve discretionary decision making). Thus, the City's disparate treatment of Plaintiffs as compared to similarly situated businesses was arbitrary, capricious, and with no rational basis.

> ### c. Plaintiffs Evidence Shows a Genuine Question of Whether Councilman Alexander and the City Altered or Extinguished Plaintiffs' Liberty Interests Through Stigmatizing and Defamatory Statements Concerning Plaintiffs.

In *Paul*, the Supreme Court held that to allege a procedural due process violation of a liberty interest in reputation based on a defamatory expression by the government, a plaintiff must satisfy what became known as the "stigma-plus" test. *Paul v. Davis*, 424 U.S. 693, 701-02 (1976); *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1302 (11th Cir. 2001).  Under this test, "a plaintiff . . . must establish the fact of the defamation 'plus' the violation of some more tangible interest before the plaintiff is entitled to invoke the procedural protections of the Due Process Clause." *Paul,* 424 U.S. at 701–02. In considering what satisfies the "plus" prong of this analysis, the *Paul* Court looked to whether state action had significantly altered or extinguished "a right or status previously recognized by state law." *Id.* at 708.

In the context of procedural due process claims within the "stigma plus" framework from *Paul*, the Eleventh Circuit has "acknowledged and reaffirmed . . . that business reputation/goodwill is both a property and a liberty interest which is protectable under the scope of Section 1983." *Little v. City of North Miami*, 805 F.2d 692, 969 (11th Cir. 1986) (holding that the damage to an attorney's business reputation satisfies the "plus" standard from *Paul*). Similarly, the Supreme Court of Georgia has recognized legitimate, protectable property interests in licenses and permits such as alcohol licenses and sign permits. *See Goldrush II v. City of Marietta*, 267 Ga, 683, 696-97 (1997) (holding that ordinances setting forth criteria for the issuance of licenses and permits create a property interest in such licenses and permits that are protected by the Constitution). In addition, courts in the Eleventh Circuit have also recognized several other altered or extinguished rights as a sufficient "plus" under the "stigma plus" test. *See Thomas v. Bucker*, 2012 WL 3978671, *5-6 (M.D. Ala. 2012) (holding that being falsely labeled a child abuser affects the plaintiff parents' right to establish a home and raise children, right to family integrity, and right to future intended employment and educational opportunities); *see also Collier v. Buckner*, 303 F.Supp.3d 1232, 1267 (M.D. Ala. 2018) (finding that the right to contract and the right to participate in the education and upbringing of children are protected interests that satisfy the "plus" element).

Perhaps most importantly, the 11th Circuit recently held that although defamation without the 'plus' is insufficient to deprive a plaintiff of his right to due process, an official's defamatory speech alone is actionable under the First Amendment if the defamatory speech was retaliatory under the "ordinary firmness" test described in *Bennett*. *Echols v. Lawton*, 913 F.3d 1313, 1322 (2019) ("We reject the notion that the First Amendment protects an official's defamatory speech from a claim of defamation."); *Bennett*, 423 F.3d at 1254. In *Echols*, the court held that a former prisoner could bring a stand-alone defamation claim under § 1983 where the district attorney made the defamatory statements in retaliation for the former prisoner seeking legislative compensation for his wrongful convictions. 423 F.3d at 1323.

As a preliminary matter, the "stigma" component of Plaintiffs' procedural due process/reputation claim against the City and Councilman Alexander is satisfied because the evidence establishes Plaintiffs' state law claim for defamation against Councilman Alexander – this analysis is discussed in greater detail below.

Under the "plus" prong of the "stigma plus" test, Mr. Whitson has experienced the loss or substantial alteration of numerous recognized state law rights. As described above, Plaintiff has a state-recognized property interest in both his alcohol and sign permits, yet the City refused to process these permits, at least in part because of Councilman Alexander's false and stigmatizing statements to City officials who

oversee permit processing. *Goldrush*, 267 Ga, at 696-97 (1997); (Harris Dep. – 116 ls 5 thru p. 117 ls 9; p. 138 ls 23 thru p. 139 ls 6; Ex. 27; Ex. 71). In addition, Plaintiff Whitson suffered tangible harm to his business reputation and right to earn a living, as evidenced in part by Facebook comments of Stockbridge residents on the City-linked "Because We Care page" and by the Expert Damages Report of Marc Effron. (Whitson Aff. ¶ 54; Ex. 237). Similarly, Plaintiffs' right to freely enter contracts, earn a living, and seek future employment opportunities were infringed by the City's stigmatizing statements because Plaintiffs stopped receiving offers to participate in barbeque festivals after Councilman Alexander called Plaintiff Whitson a registered sex offender online. (Whitson Dep. – p. 83 ls 13 thru p. 87 ls 25; Whitson Dep. – p. 314 ls 1 thru p. 315 ls 18). Finally, Plaintiffs' right to family integrity and to participate in the upbringing of his children have been infringed by Councilman Alexander and the City's defamatory and stigmatizing statements because Plaintiff Whitson has been questioned by parents of his daughters' friends and classmates if he is a convicted sex offender. (Whitson Aff. ¶¶ 52-60).

C.   Plaintiffs' State Law Defamation ("stigma") Claim Against Councilman Alexander

Under Georgia law, to establish a claim for defamation a plaintiff must show "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of

special harm." *Wertz v. Allen*, 313 Ga.App. 202, 205 (2011). A libel is statutorily defined as the "false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1(a). Finally, if a libel claim "consists of a charge that one is guilty of a crime, dishonesty, or immorality," or "that tends to injure one in his trade or business," and the words are defamatory on their face, then the claim is characterized as libel per se and damages are presumed. *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (2002). Finally, slander is defined as an oral defamation that consists in "(1) Imputing to another a crime punishable by law; (2) Charging a person with having some contagious disorder or with being guilty of some debasing act which may exclude him from society; (3) Making charges against another in reference to his trade, office, or profession, calculated to injure him therein; or (4) Uttering any disparaging words productive of special damage which flows naturally therefrom." O.C.G.A. § 51-5-4. Damages are inferred in sections (1) through (3) of the slander statute. *Id.*

### a. Councilman Alexander's Defamatory Statements

Beginning in 2016 and continuing through 2019, Councilman Alexander has made numerous libelous and slanderous statements about Plaintiff Whitson and GCBC to the citizens of Stockbridge, reporters, elected officials, and social media activists, among others. Councilman Alexander has published the defamatory

statements on his various social media pages, including the City-linked "Because We Care Page," sent such defamatory statements through the City email server, and made oral defamatory statements to several people. (Ex. 38; Ex. 123; Ex. 125; Ex. 127; Ex. 400; Ex. 401; Ex. 402; Ex. 403; Ford Dep. – p. 147, ls 2 thru p. 149 ls 1; HD – 130 ls 18 thru p. 131 ls 3; Holiday Dep. – 172 ls 2-23; GD – p. 74 ls 11 thru p. 77 ls 3; Alexander Dep. – p. 112 ls 11-24).

Regarding social media, Councilman Alexander has defamed Mr. Whitson on the internet using a myriad of City-linked social media accounts with tens of thousands of followers. (Alexander Dep. – p. 167 ls 22 thru p. 169 ls 6, p. 170 ls 4-18; 151 ls 14 thru p. 155 ls 13; 206 ls 5 thru p. 211 ls 6). Such accounts that Councilman Alexander either owns or is the administrator of include, but are not limited to, "Because We Care Henry County - Atlanta South," ("Because We Care") "Stockbridge Atlanta South," "Progressive Atlanta South," and Elton Alexander's personal page. (Alexander Dep. – p. 41 ls 11-15). Moreover, the City's official biography webpage lists these social media sites as tools for Councilman Alexander to conduct city business, and the City's Official Facebook Page links directly to Councilman Alexander's Because We Care page. (Gantt Dep. – 74 ls 11 thru 77 ls 3; Ex. 125, 39; Ford Dep. – p. 183 ls 20 thru p. 185 ls 8; Ex. 146; Ford Dep. – 186 ls 5 thru p. 188 ls 7; Ex. 144, 145). Also, the City provided an Award to Alexander for his use of the social media site Because We Care to promote the City of

Stockbridge before or near the time Alexander first took office. (Alexander Dep. – 293 ls 21 thru p. 294 ls 11). Finally, Councilman Alexander testified that the Because We Care page has over 20,000 followers and posts on that page have reached as many as 170,000 people in one week. (Alexander Dep. – 292 ls 8-18).

On March 10, 2017, Defendant Alexander made a series of defamatory and malicious posts concerning Plaintiff on Councilman Alexander's public Because We Care, Progressive Atlanta South, and personal Facebook pages. (Ex. 400; Ex. 401; Ex. 402; Ex. 403; Ex. 123; Ex. 125; Ex. 127; Whitson Aff. Ex. ¶¶ 113-118). The public posts by Councilman Alexander, which included a picture of the GCBC restaurant, stated unequivocally that Plaintiff Whitson is a "sex offender" and was only recently removed from the "sex offender registry." (Ex. 400; Ex. 401; Ex. 402; Ex. 403; Ex. 123; Ex. 125; Ex. 127; Whitson Aff. Ex. ¶¶ 113-118). Plaintiff Whitson is not and has never been a convicted sex offender or on a sex offender registry. (Whitson Aff. ¶ 44). Moreover, in a comment to the March 10, 2017 Facebook post Councilman Alexander stated that "The business closes at any old time because he leaves to victimize our community at all hours." (Whitson Aff. ¶ 44). This statement is also false. *Id.* The libelous March 10, 2017 Facebook post and comment were published on the City-linked Because We Care page with over 20,000 followers, was shared at least twenty-one (21) times by people other than Councilman Alexander, and it contains at least seventeen (17) comments (Ex. 400; Ex. 401; Ex. 402; Ex.

403; Ex. 123; Ex. 125; Ex. 127; Whitson Aff. Ex. ¶¶ 113-118). Moreover, Councilman Alexander personally tagged at least fifty (50) other Facebook accounts in the underlying defamatory post, including WSB-TV, 11Alive, CBS46, Fox 5 Atlanta, and elected officials, social media activists, pastors, and Stockbridge residents. (Ex. 400; Ex. 401; Ex. 402; Ex. 403; Ex. 123; Ex. 125; Ex. 127; Whitson Aff. Ex. ¶¶ 113-118); Alexander Dep. – p. 140 ls 8 thru p. 149 ls 24). Councilman Alexander also shared the same defamatory post on his personal Elton Alexander Facebook page and on the Progressive Atlanta South Facebook page, which each garnered numerous additional shares and comments. (Ex. 400; Ex. 401; Ex. 402; Ex. 403; Ex. 123; Ex. 125; Ex. 127; Whitson Aff. Ex. ¶¶ 113-118). Councilman Alexander's March 10, 2017 defamatory post has only been edited slightly since it was originally published, and has never removed to taken down. (Ex. 400; Ex. 401; Ex. 402; Ex. 403; Ex. 123; Ex. 125; Ex. 127; Whitson Aff. Ex. ¶¶ 113-118). It can still be publicly accessed today on Councilman Alexander's City-linked Facebook page, along with all of the comments, shares, and tags. (Ex. 400; Ex. 401; Ex. 402; Ex. 403; Ex. 123; Ex. 125; Ex. 127; Whitson Aff. Ex. ¶¶ 113-118).

On August 5, 2019 Councilman Alexander published another libelous public statement about Plaintiff Whitson on Facebook when he stated that "The white man puppet master Stuart paid the Bbq Guy to lie . . . just the facts." (Ex. 159). This false statement was published on the public Facebook page of an internet Disc Jockey

who claims to have over 100,000 listeners. (Alexander Dep. – p. 255 ls 9 thru p. 267 ls 16; Ex.'s 136 & 159).

In addition to making numerous defamatory statements concerning Plaintiffs on personal and City-linked social media, Councilman Alexander has also utilized his City email and personal email to publish defamatory statements concerning Plaintiffs. In an email dated March 10, 2017, the same day as the Plaintiff Alexander's defamatory Facebook post discussed above, Councilman Alexander forwarded the content of the false and defamatory Facebook post to a Ms. Randolph from Alexander's personal email. (Ex. 322). The email contains the same false, unequivocal statement calling Plaintiff Whitson a "sex offender" on the "sex offender registry." *Id.* In addition, the false and defamatory message Councilman Alexander forwarded to Ms. Randolph on March 10, 2017 was also sent by Alexander to someone else earlier at 10:37 a.m., as can be seen from the document. *Id.* This original 10:37 a.m. email would have also constituted a defamatory communication; however, the "To" line was deleted or removed from the underlying email, between the date and subject lines, without explanation. *Id.* Counsel for Plaintiff's were informed that the underlying email containing the defamatory statement no longer exists and cannot be produced. In addition, in the body of the forwarded email to Ms. Randolph, Councilman Alexander instructed Ms. Randolph to communicate with him only on his personal email – the email he controls – and

not his City email to avoid Mr. Whitson's open records requests and discovery requests. *Id.* Only two days prior, the City Manager informed Councilman Alexander that the City had received an Open Records Request from Mr. Whitson concerning Alexander. (Ex. 69). Plaintiffs have been provided no subsequent communications between Councilman Alexander and Ms. Randolph.

On February 1, 2017, Councilman Alexander sent a false and defamatory email to the City Council, City Clerk Vanessa Holiday, Michael Williams, and City Manager Harris stating that Plaintiff BBQ Masters "illegally remodeled their new location without a permit" and that Plaintiff Whitson was doing a "major renovation" in violation of the building codes. (Ex. 24). The Plaintiffs conducted no illegal remodeling or major renovations, and there were no fines or violations issued by the County. (Whitson Aff. ¶ 78; Patterson Dep. – 24 ls 12-17; Ex. 24; *Patterson depo references Ex. 73 but means Ex. 24).

On February 4, 2017, Councilman Alexander sent an email to the Mayor and City Council falsely stating that Arick Whitson is "convicted domestic violence offender." (Ex. 37;  Ford Dep. – p. 154, ls. 19 thru p. 155, ls 11; Harris Dep. – p. 130 ls 10-14; Doc. 190 City Williams I Dep., p. 37 ls 14 thru p. 38 ls 18; Whitson Aff. ¶ 44). This communication was patently false; however, the same defamatory communication was sent to the City Clerk Vanessa Holiday via email, and it was stated orally by Councilman Alexander to City Manager Harris. (Holiday Dep. 172.

Ls 2-25; 4-10; Harris Dep. – p. 130 ls 10-14; Whitson Aff. ¶¶ 44). Councilman Alexander knew this statement to be false – in his deposition, Councilman Alexander admitted that he has never seen a conviction for domestic violence for the Plaintiff Whitson. (Alexander Dep. – p. 188, ls 1 – 12).

On February 24, 2017, Councilman Alexander sent a false and defamatory communication to the Solicitor's office which stated that Plaintiff Whitson allegedly provided bad checks to a vendor and that there were "Multiple victims of Arick Whitson." Plaintiff Whitson never sent bad checks to any vendor. (Ford Dep. – 169, ls 7-24, p. 170, ls 1-6; Ex. 133; Whitson Aff. ¶ 45). Councilman Alexander republished this same false allegation to Councilman Robinson, Mayor Ford, Michael Williams, and City Manager Harris on February 16, 2017. (Harris Dep. – p. 148 ls 14-25; Ex. 72).

On February 27, 2017, Councilman Alexander sent another false email to the Mayor, City Council, City Clerk Holiday, and City Manager Harris stating to them that the Plaintiff was just removed from the sex offender registry last year. Plaintiff Whitson has never been a convicted sex offender and has never been on the sex offender registry.  (Ford Dep. – p. 147, ls 2 thru p. 149 ls 1; Harris Dep. – 130 ls 18 thru p. 131 ls 3; Holiday Dep. – 172 ls 2-23; Gantt Dep. – p. 74 ls 11 thru p. 77 ls 3; Alexander Dep. – p. 112 ls 11-24; Whitson Aff. ¶ 44; Ex. 38).

On March 2, 2017, in a defamatory email to the investigators who were investigating the City Complaint Councilman Alexander falsely states that Plaintiff Whitson was previously on the sex offender registry and was removed from the sex offender registry in 2016 after his sentence on a previous conviction. (Alexander Dep.– 119 ls 24 thru p. 120 ls 8; Ex. 40; Whitson Aff. ¶ 44).

On March 8, 2017, Councilman Alexander sends another false email stating that Plaintiff Whitson sent sexually explicit videos to 45,000 employees. (Ford Dep. – 167, ls 25 thru p. 168 ls 3, p. 169 ls 3-6; p. 170, ls 1-6 Ex. 41, Ex. 69;  Harris Dep. – p. 138 ls 23 thru p. 139 ls 6; p. 144 ls 21 thru p. 145 ls 19;  p. 144 ls 21 thru p. 145 ls 19, p. 166 ls 12 thru p. 167 ls 17, p. 168 ls 2-17 Gantt Dep. – 79 ls 13-18; Doc. 190 City Williams I Dep., p. 37 ls 14 thru p. 39 ls 13). This email was sent to the Mayor, City Council, City Clerk, and City Manager, and the independent group investigating Plaintiff Whitson's City Complaint. *Id.*

Finally, at either an open or executive session meeting of the City Council on November 28, 2017, Councilman Alexander falsely stated aloud to city officials that Plaintiff Whitson is a "child molester." (Blount Dep. – p. 99, ls 1-25)[4]. Councilman Alexander's false statements concerning Plaintiffs referenced in this section shall

---

[4] Alexander has published additional defamatory statements concerning Plaintiff, which are described in Plaintiffs' Statements of Additional Facts. Plaintiff is not waiving its right at this stage in the litigation to pursue those claims.

collectively be referred to as the "Designated False Statements" for the analysis below.

> **b. All of Councilman Alexander's statements and communications concerning Plaintiffs cited above are (1) false; (2) were stated as fact; (3) were published; (4) unprivileged; and (5) were published with actual malice or intent to cause injury.**

All of Councilman Alexander's statements concerning Plaintiffs cited above are false. That is Plaintiffs have affirmatively provided evidence proving the false nature of Councilman Alexander's defamatory statements, and Defendants have provided no evidence to the contrary. Specifically, Plaintiff Whitson is not and has never been a convicted sex offender or placed on a sex offender registry – this false allegation was published a multitude of times by Councilman Alexander on numerous platforms without providing any factual background or support. (Ex. 400; Ex. 401; Ex. 402; Ex. 403; Ex. 123; Ex. 125; Ex. 127; Whitson Aff. Ex. ¶¶ 44, 113-118). In addition, the former Mayor Stuart never paid Plaintiff Whitson to lie; Plaintiff Whitson never performed an illegal remodel of his restaurant nor did he conduct a major renovation in violation of building codes; Plaintiff Whitson is not a "convicted domestic violence offender"; Plaintiff Whitson never sent bad checks to a vendor; Plaintiff Whitson did not send sexually explicit videos to 45,000 employees; and Plaintiff Whitson is not a "child molester." (Whitson Aff. ¶44).

Second, Councilman Alexander's statements concerning Plaintiffs referenced above do not qualify as opinions under Georgia law – each implied assertion of

objective fact, each can all be proven false, and none are premised on facts previously disclosed in the communication. *Cottrell v. Smith*, 229 Ga. 517, 523 (2016). More specifically, Councilman Alexander's statements, as published, leave no room for a difference of opinion or subjective interpretation.

Generally, "an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false." *Id.* That is, "statements of pure opinion are not capable of being proven false and cannot form the basis of a defamation claim." *Id.* However, a defendant cannot simply hide behind a label of opinion to avoid liability. *See id.* ("[t]here is ... no wholesale defamation exception for anything that might be labeled opinion."). The Supreme Court provided an illustrative observation in *Milkovich v. Lorain Journal Co.*, when it stated:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'"

*Milkovich v. Lorain Journal Co.* 497 U.S. 1, 18-19 (1990).

Councilman Alexander's straightforward, unambiguous, and unqualified statement that Plaintiff Whitson is a "registered sex offender" and on the "sex

offender registry" is a provable falsehood. Ex. 400; Ex. 401; Ex. 402; Ex. 403; Ex. 123; Ex. 125; Ex. 127; Whitson Aff. Ex. ¶¶ 113-118, 44). The same is true for Councilman Alexander's statements that Plaintiff Whitson is a "convicted domestic violence offender" and a "child molester." (Ford Dep. – p. 147, ls 2 thru p. 149 ls 1; Harris Dep. – 130 ls 18 thru p. 131 ls 3; Holiday Dep. – 172 ls 2-23; GD – p. 74 ls 11 thru p. 77 ls 3; Alexander Dep. – p. 112 ls 11-24; Blount Dep. – 99, ls 1-25; Whitson Aff. ¶ 44; Ex. 38). Moreover, these statements are not rhetorical or hyperbolic – Alexander stated them as unambiguous facts, and he repeated the exact same statements over and over without altering the language. (*Id.*). Similarly, Alexander's statements concerning illegal remodeling, sending a sexually explicit video to 45,000 people, and taking money from a former elected official to publicly lie are also stated unequivocally and without contextual factual basis. (Ex. 41; Ex. 67; Harris Dep. - p. 133 ls 23 thru p. 134 ls 13; Whitson Aff. ¶ 112). They are all provable falsities, not subject to interpretation. In particular, Councilman Alexander's false statement that Plaintiff Whitson sent a sexually explicit video to 45,000 people does not constitute hyperbolic or rhetorical expression because Alexander repeated this same statement and the same number or alleged recipients, 45,000, in multiple communications on Facebook and via email. (Ex. 41; Ex. 67; Harris Dep. - p. 133 ls 23 thru p. 134 ls 13; Ex. 69; Ex. 67; Ex. 41; Whitson Aff. ¶¶

44, 112). Thus, none of Alexander's false statements described above qualify as "opinion."

Third, Alexander's argument that some of his false and stigmatizing statements concerning Plaintiff Whitson were not published because they were communicated to City officials is misguided. In the context of an intra-corporate exception to the "published" requirement of a defamation claim, Defendant Alexander fails to cite any authority where such an intra-corporate exception is applied to a municipality or government officials. (Doc. 214-1, p.37-38). Moreover, the intra-corporate exception only applies to statements or communications that are "between members of unincorporated groups or associations, and ... heard by one who, because of his/her duty or authority has reason to receive ...[that] information." (Underline added.) *Kurtz v. Williams*, 188 Ga.App. 14, 15 (1988). In addition, when the statement is made to someone who "has a distinct duty to remain independent of the [speaker]," a publication occurs, and the intra-corporate exception does not apply. *See TSG Water Resources v. D'Alba & Donovan Certified Public Accountants,* 366 F.Supp.2d 1212, 1227(IV) (S.D.Ga.2004), overruled on other grounds (holding that a publication has occurred when an accountant, hired to audit the financial statements of a client has a distinct duty to remain independent of that client.).

The City Council and Mayor are public trustees and fiduciary officers of the citizens and business owners of Stockbridge, including Plaintiffs. (Doc. 139-9 Harris Dep. – 152 ls 22 thru p. 154 ls 12).  Moreover, these City officials are elected by taxpayers, including Plaintiffs. Thus, it is against public policy and against their elected duty for an elected City Councilmember, Defendant Alexander, to make numerous false statements about its citizens to other government officials, and then hide behind the cloak of an intra-corporate exception to publication. In addition, Defendant Alexander's reliance on the intra-corporate privilege with regard to the Designated False Statements described above fails for two additional reasons. First, the recipients of Alexander's false statements did not have a reason to receive those statements because of a specific duty or authority. That is, unsolicited false statements Councilman Alexander sent to the Mayor, City Council, and other city officials stating that Plaintiff Whitson was a "convicted domestic violence offender," a "convicted sex offender," and "child molester" were not received because of some authority, duty, or government-related purpose. Rather, the recipients of those false and defamatory statements had no reason to receive them – the only reason they did was because of Defendant Alexander's hatred and animus for Plaintiff Whitson and his continuous desire to harass, intimidate, and retaliate against Mr. Whitson for exercising his First Amendment right. Second, every false statement concerning Plaintiff Whitson that Councilman Alexander communicated or emailed to the

investigators of Plaintiff Whitson's City Complaint are also deemed published under the analogous facts of *TSG Water Resources*. Specifically, those false statements concerning Plaintiff, including the Designated False Statements, were communicated by Alexander to someone with a distinct duty to remain independent of Councilman Alexander. Both the City and Councilman Alexander have repeatedly highlighted the fact that the City hired an "independent investigator" to investigate the complaints against Alexander.  At the time, Councilman Alexander attempted to taint that the investigation of Plaintiff Whitson's City Complaint with false and stigmatizing statements about Plaintiffs, and now Councilman Alexander attempts to exclude those same false statements because he attempted to meddle with the investigation. (Ex. 40; Ex. 69). Thus, all such false statements were published.

Fourth, Councilman Alexander's Designated False Statements above are subject to neither absolute nor qualified privilege, but he is attempting to use privilege "merely as a cloak for venting private malice." *Sparks v. Parks*, 172 Ga. App. 823, 825-26 (1984). However, to the extent this Court determines that the Designated False Statements are protected by qualified privilege, the Designated False Statements are still actionable because they were published with malicious intent. All nine privileges enumerated under O.C.G.A. § 51-5-7 are qualified or conditioned privileges. *See* § 51-5-7; *Wertz v. Allen*, 313 Ga. App. 202, 206 (2011). Moreover, "in order to establish that a statement is conditionally privileged, the party

charged with making the otherwise defamatory statement must show that "(a) she acted in good faith; (b) in connection with an interest to be upheld; (c) the statement was properly limited in its scope and occasion; and (d) publication was made to proper persons." *Smith v. DiFrancesco*, 341 Ga. App. 786, 790 (2017). Finally, with regard to overcoming a qualified privilege with a showing of malice, "Georgia courts have repeatedly held that the issue of malice in conditional privilege cases is generally a jury issue, inappropriate for summary judgment." *Hammer v. Slater*, 20 F.3d 1137, 1143 (1994). Finally, on the issue of malice, a private plaintiff needs only to provide malice under an ordinary negligence standard. *Gettner v. Fitzgerald*, 297 Ga. App. 258, (2009).

Councilman Alexander's Designated False Statements concerning Plaintiff Whitson do not satisfy the requirements of qualified immunity under O.C.G.A. § O.C.G.A. § 51-5-7. Any assertion that Councilman Alexander's Designated False Statements and other false, harassing, and stigmatizing statements concerning Plaintiffs were made "in good faith" in connection with an issue of public interest or concern is simply incorrect. First, none of the defamatory statements Councilman Alexander made concerning plaintiffs Whitson were made in "good faith" or "properly limited in scope and occasion." To the contrary, the Designated False Statements and many other of Alexander's harassing and stigmatizing statements concerning Plaintiff Whitson were published as a result of Alexander's hatred and

animus towards Whitson and his desire to chill Mr. Whitson's First Amendment rights – not out some public duty, moral right, or public interest. (Ex. 123; Ex. 125; Ex. 127; Ex. 400; Ex. 401; Ex. 402; Ex. 403; Ex. 40; Ex. 69). The evidence shows that Councilman Alexander was only concerned with his own interests. (Ex. 44). As a simple illustration of this point, when Councilman Alexander incorrectly believed that he had finally found evidence on November 10, 2017 that Mr. Whitson was a sex offender, a full eight months after Alexander's March 10, 2017 social media posts, Councilman Alexander was elated and texted, "My lawyer is the bomb! Whitson served time for sexual contact with a minor in Ohio. He was or is a sex offender…smh!" (Ex. 44). When Councilman Alexander subsequently learned that Mr. Whitson was in fact not a sex offender, Council Man Alexander texted, "Unfortunately the Eric Smith who spent time in jail in Ohio is not the same person . . ." (Underline added) (Ex. 44).  In addition, the Designated False Statements and numerous other harassing and stigmatizing statements of Alexander concerning Plaintiffs were not limited in scope or by occasion. Rather, Alexander did everything in his power, and in fact used his power and resources as a City Councilmember, to publish those false and stigmatizing statements to as many people as he could reach. Councilman Alexander even used a fake Facebook profile he created, Frank Noble, to spread his lies and to create a sense of false legitimacy on social media to Councilman Alexander's false underling statements. (Ex. 403; Ex. 173; Alexander

Dep. - p. 150 ls 7 thru 25, p. 271 ls 5 thru p. 272 ls 4; Ex.123; Ex. 125; Ex. 127; Ex. 203; Ex. 400; Ex. 401; Ex. 402).

Finally, concerning the issue of malice, Alexander's only argument in his Renewed Motion for Summary Judgment is a simple statement that "the record is devoid of any evidence that Defendant Alexander made the allegedly false statements with any intent to injure Plaintiffs. (Doc. 204-1, p. 44). Despite Defendant Alexander's assertion, record is replete with evidence of Alexander's intent to cause "deliberate intent to harm [Plaintiffs] and "reckless disregard for the truth." *See St. Amant v. Thompson*, 390 U.S. 727, 731-32 (1968). One simple fact points directly to a finding of malice – Despite Councilman Alexander admitting and testifying that he is aware that Plaintiff Whitson is not a "registered sex offender, "on a sex offender registry," or a "convicted domestic violence offender," Councilman Alexander has refused to retract those proven, false public statements or remove them from the public domain – even after receiving a Cease and Desist letter from Plaintiffs' council and facing this instant federal lawsuit. (Ex. 47;  Harris Dep. - 140 ls 21-23; p. 141 ls 15 thru p. 142 ls 19; Holiday Dep. - p. 30 ls 22-25; p. 42 ls 17 thru p. 43 ls 10; p. 49 ls 1 thru p. 54 ls 20; p. 55, ls 3-13, p. 97 ls 14-22, p. 174 ls 18 thru p. 175 ls 7, Alexander Dep. – p. 314 ls 23 thru p. 315 ls 22, p. 359 ls 10-13 ; Ex. 47 and Ex's 33-38; Doc. 190 City Williams I Dep., p. 72 ls 14 thru p. 73, ls 16, p. 74 ls 4 thru p. 75 ls 7, p. 79 ls 4 thru p. 80 ls 11; Ex. 123; Ex. 125; Ex. 127; Ex. 400; Ex.

401; Ex. 402; Ex. 403). During his deposition, Alexander's only response was that "People have a right to be wrong." (Alexander Dep. – p. 106, ls 15 thru p. 107 ls 3).

In addition, Plaintiffs have proven that they suffered financial injury as a result of Councilman Alexander's retaliatory, stigmatizing, and defamatory conduct. Whitson testified extensively concerning how he lost business revenue and festival income during and following Councilman Alexander's campaign of retaliatory, harassing, a defamatory conduct toward Plaintiffs. (Whitson Dep. - 83 ls 13 thru p. 87 ls 25; Whitson Dep. – 314 ls 1 thru p. 315 ls 18). In addition, Plaintiffs' damages expert, Marc Effron, determined that Plaintiffs have lost millions of dollars in revenue as a result of Councilman Alexander's retaliatory and defamatory conduct and the City's refusal to process alcohol and sign permits, as summarized in Effron's damages report entitled "Assessment of Lost Profits," dated February 5, 2020. (Ex. 237). Finally, as a direct response to Alexander's false and defamatory statements calling Plaintiff Whitson a "sex offender" and on the "sex offender registry" posted on social media on March 10, 2017, multiple Facebook users commented that they would no longer be eating at the GCBC restaurant as a result. (Ex. 123; Ex. 125; Ex. 127; Ex. 400; Ex. 401; Ex. 402).

### c. Defendant Alexander is not entitled to qualified, official, or supplemental immunity.

The evidence establishes that Councilman Alexander is not entitled to any form of immunity. "Qualified immunity protects [state actors] from § 1983 suits for civil damages arising from the discharge of their discretionary functions as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Douglas Asphalt Co.*, 541 F.3d at 1273. In order to claim qualified immunity, a defendant must first establish that the challenged conduct was within the scope of his or her discretionary authority. *Bennett*, 423 at 1250. If the defendant satisfies that burden, "the burden then shifts to the plaintiffs to establish a constitutional violation." *Id.* Moreover, "[t]o act within the scope of discretionary authority means that the actions were (1) undertaken pursuant to the performance of the official's duties and (2) within the scope of his authority." *Collier v. Dickinson*, 477 F.3d 1306, 1308 (11th Cir. 2007). Finally, Plaintiffs seeking to overcome a defendant's qualified immunity privilege must show that (1) the state actor violated their constitutional or statutory rights, and (2) those rights were clearly established at the time the state actor violated them. *Douglas Asphalt Co.*, 541 F.3d at 1273.

As a preliminary matter, Defendant Alexander's qualified immunity defense fails because some of his harassing, retaliatory, and stigmatizing conduct was not within his discretionary authority as a City Council member. Although Alexander states that when he is posting on social media, he is posting both on behalf of himself

and the City, his intentional act of targeting, retaliating, and defaming Plaintiff Whitson and others on social media, such as by calling Mr. Whitson a "sex offender" on the "Sex offender registry" was not undertaken pursuant to the performance of Alexander's duties as a City Councilmember. This is not to state that the City was unaware of Alexander's widespread and continuous retaliatory conduct against Plaintiffs and others. The City was particularly aware of Alexander's history of intimidating and retaliating people and businesses online – it just chose to take no substantive action against Alexander to stop the conduct. (Ford Dep. – 124, ls 19-25; 119, ls. 1-25; Ex. 16; Blount Dep. – 40, ls 2-19; HD – 98 ls 9 thru p. 99 ls 5).

Second, the evidence has established, and it has been analyzed extensively above, that Councilman Alexander violated Plaintiffs constitutionally protected rights. Third, Plaintiffs constitutional rights that Councilman Alexander violated are clearly established. A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is "apparent," *see Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, (1987), and if a constitutional rule applies with "obvious clarity" to give a state actor "fair warning" that violating that right is actionable. *Vineyard v. Wilson*, 311 F.3d 1340, 1350-52 (2002).

Defendant Alexander was well aware that his defamatory, retaliatory, and stigmatizing conduct were violating clearly established constitutional rights, as it was apparent that his conduct was unlawful – Alexander was specifically told so in

a cease and desist letter, a separate communication by from the City's attorney, and in Plaintiffs' lawsuit. Yet, Councilman Alexander's unconstitutional and retaliatory conduct persisted. (Ex. 47; Doc.1; Ex. 224). *See Bailey,* 843 F.3d at 485 (finding that a law enforcement officer's retaliatory issuing of be on the lookout advisory labeling the plaintiff as a "loose cannon" and a "danger" violated clearly established rights); *see also Bennett*, 423 F.3d at 1255-56 (finding that the right to not be retaliated against exercising the First Amendment was clearly established).

With regard to "official immunity," Councilman Alexander is not entitled to the protection because he acted with actual malice – this analysis is addressed above concerning qualified immunity. Moreover, analogous to the facts in the present dispute, the defendant officer in Bailey was not entitled to an official immunity defense because the issuance of a retaliatory and defamatory be-on-the-lookout advisory labeling the plaintiff as a "danger" indicated a deliberate intention to do wrong. *See Bailey,* 843 F.3d at 486.

Lastly, Councilman Alexander is not entitled to supplemental immunity under O.C.G.A. § 51-1-20(a). The statute applies only members, directors, trustees, or board members, which Councilman Alexander is not. More importantly, as has been discussed and established above, Councilman Alexander was not acting in "good

faith" with regard to his campaign of harassing, retaliatory, and defamatory actions.

Rather, his misconduct was willful and wanton.[5]

### III.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny

Defendant Alexander's Renewed Motion for Summary Judgment.

{Signatures on the following page}


Respectfully submitted this 2nd day of July, 2020.


{Signatures on the following page}

---

[5] As a final note, Plaintiffs summarily object to all allegations in Defendant Alexander's Renewed Motion for Summary Judgment concerning any crime Plaintiffs allegedly committed and request all such references be stricken. (Doc. 204-1, p. 29-32). The allegations in Defendant Alexander's Renewed Motion contain numerous hearsay statements and inadmissible allegations of misdemeanors. Plaintiff has never been convicted of any felony. (*Id.*; Whitson Aff. ¶ 73). Fourth, many of the allegations made in Defendant Alexander's Renewed Motion for Summary Judgment are over ten (10) years old and therefore inadmissible. Finally, the statement produced by Ms. Randolph, Exhibit 26 to Alexander's Renewed Motion for Summary Judgment, was signed on April 15, 2020 but intentionally withheld from Plaintiffs until the filing of Defendant Alexander's brief on June 10, 2020. (Doc. 204). The document is not sworn or notarized, and Plaintiffs were not given an opportunity to depose Ms. Randolph after the statement was made on April 15, 2020. In addition, Alexander intentionally attempted to conceal communications concerning Ms. Randolph from Plaintiffs. (Ex. 322).

HECHT WALKER, P.C.

By:  /s/ Michael W. Warner
    Greg K. Hecht
    Georgia Bar No. 003860
    Michael Warner
    Georgia Bar No.  751362

205 Corporate Center Drive    COUNSEL FOR PLAINTIFFS
Suite B    ARICK WHITSON and GEORGIA
Stockbridge, Georgia 30281    CHAMPIONSHIP BARBECUE
(404) 348-4881    COMPANY, d/b/a BBQ Masters
greg@hmhwlaw.com
michael@hmhwlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISON

ARICK WHITSON, GEORGIA            )
CHAMPIONSHIP BARBECUE             )
COMPANY d/b/a                     )
BBQ Masters,                      )
                                  )
            Plaintiffs,           )     CIVIL ACTION FILE NO.
                                  )
v.                                )     1:17-cv-01985-JBP
                                  )
CITY OF STOCKBRIDGE,              )
GEORGIA and ELTON ALEXANDER,      )
in his Individual Capacity,       )
                                  )
            Defendants.           )

## CERTIFICATE OF COUNSEL AND SERVICE

I hereby certify, pursuant to LR 7.1(D), NDGa., that the foregoing was prepared using Times New Roman 14-Point font in accordance with Local Rule 5.1(C).

I also certify that, on this day, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

This 2nd day of July, 2020.

{Signatures on the following page}

HECHT WALKER, P.C.

By: /s/ Michael W. Warner
    Greg K. Hecht
    Georgia Bar No. 003860
    Michael Warner
    Georgia Bar No.  751362

205 Corporate Center Drive    COUNSEL FOR PLAINTIFFS
Suite B    ARICK WHITSON and GEORGIA
Stockbridge, Georgia 30281    CHAMPIONSHIP BARBECUE
(404) 348-4881    COMPANY, d/b/a BBQ Masters
greg@hmhwlaw.com
michael@hmhwlaw.com